1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**DAVID CERVANTES, JAMES PEREZ, GUILLERMO SOLORIO, AND GEORGE FRANCO,**

Defendants.

Case No. 21-cr-328-YGR-1
Case No. 21-cr-328-YGR-3
Case No. 21-cr-328-YGR-5
Case No. 21-cr-328-YGR-7

**PRETRIAL ORDER NO. 12 RE RULINGS RELATIVE TO THE RELATIONSHIP BETWEEN CDCR AND THE FEDERAL TASK FORCE**

The Court previously invited the trial defendants and government to file statements of position regarding the relationship between the California Department of Corrections and Rehabilitation ("CDCR") and FBI's Santa Clara County Safe Streets Task Force (the "Task Force") in connection with the investigation leading to the Indictment.

Having carefully reviewed the parties' submissions and oral argument made at various times during pretrial proceedings, the Court **FINDS** as follows:

*One*, CDCR was not under the control or subject to the direction of the Task Force during the investigation which led to the indictment in this action. *Two*, as a result, the government's *Brady* and Rule 16 obligations do not extend to every document in CDCR's possession. *Three*, the additional productions and *Brady* reviews already ordered by the Court are sufficient to safeguard the trial defendants and ensure that potentially exculpatory information contained in databases viewed by Task Force Officer Chua was turned over and/or reviewed by the government for *Brady*.

Given these rulings, the trial will proceed as planned beginning with opening statements on Monday, June 24, 2024.

I.   **BACKGROUND**

The parties' dispute concerning the relationship between CDCR and the Task Force is longstanding and interwoven with similar disagreements concerning the scope and nature of the government's *Brady* and Rule 16 obligations. The Court assumes the parties' familiarity with the record and so recounts here only the facts and procedural history relative to the analysis that follows.

A.  <u>Events Preceding the Evidentiary Hearing</u>

On August 17, 2023, defendants filed a motion to compel discovery of five categories of documents: (i) text messages to and from CDCR officers regarding the defendants; (ii) documents related to the CDCR's transfer of primary custody of defendants to the Bureau of Prisons ("BOP"); (iii) recordings of jail calls to and from Nuestra Familia ("NF") leaders in BOP custody; (iv) recordings of jail calls to and from cooperator witnesses; and (v) confidential memoranda in defendants' CDCR files. (Dkt. No. 846-1 (sealed).) In short, defendants' theory was that CDCR was so intimately involved in the Task Force investigation that the government should be deemed in possession, custody, or control of *all* CDCR records, and as a result, sweeping Rule 16 disclosures and *Brady* review were warranted.

On January 22, 2024, after holding a hearing and ordering additional briefing and submissions, Chief Magistrate Judge Ryu declined to order most of the discovery requested by defendants. In a 33-page order, Chief Magistrate Judge Ryu concluded that "the evidence does not demonstrate that the CDCR was 'a lead investigative agent in this case' or that 'federal agents had open access to CDCR files' such that all CDCR materials are within the government's constructive or actual possession for purposes of their obligations under Rule 16, *Brady*, and Jencks." (Dkt. No. 1073 at 19:3–6 (sealed).)

Defendants subsequently objected to Chief Magistrate Judge Ryu's order, making essentially two main points: First, "the government is in constructive possession of *all* CDCR materials . . . since CDCR was an agent of the government for the purposes of the Task Force investigation leading to the Indictment." (Dkt. No. 1179, Pretrial Order No. 2 re Pre-Trial Motions ("Pretrial Order No. 2") at 2 (sealed) (emphasis supplied).) Second, "the government should be required to conduct a *Brady* review of all such materials and to produce to defendants those materials identified as containing potentially exculpatory information." (*Id.* (sealed).)

On March 22, 2024, the Court overruled these objections. (*See* Pretrial Order No. 2.) In an 18-page, single-spaced order, the Court found that defendants' case law and factual arguments did not require setting aside Chief Magistrate Judge Ryu's order. Notably, the Court ended its order by requiring the government to submit a written declaration from CDCR Officer Charlie Chua, who

1  served as a deputized member of the Task Force during the investigation leading to the Indictment.

2  In relevant part, the order stated:

3      [T]he Court perceives no reason why the government should not be able to easily obtain a
       declaration from Officer Chua to confirm the lack of government access to CDCR

4      materials, except where accessed pursuant to legal process . . . . Given the Court does not
       anticipate that the declaration will change any of its analysis, the Court will proceed on that

5      path. Obviously, if different, the Court will revisit the issue.

6  (*Id.* at 12 (sealed).)

7      The government timely filed the declaration. (*See* Dkt. No. 1219-2 (sealed).) However, rather

8  than reaffirm the analysis in the Court's order overruling defendants' objections, the declaration

9  raised new questions about the nature and extent of information sharing, through Chua, between

10  CDCR and the Task Force. The Court therefore set an evidentiary hearing to explore the topic and

11  ordered Chua to appear and give testimony. (*See* Dkt. No. 1222.)

12      B.  Evidentiary Hearing

13      The evidentiary hearing took place over two days: April 29, 2024, and May 7, 2024. On

14  the first day, the Court heard testimony from Chua regarding his activities as a deputized member

15  of the Task Force. It became clear over the course of his testimony that other Task Force members

16  would be better equipped to address certain topics relative to the investigation. Thus, the Court

17  ordered FBI Special Agent Andrew Jimenez, another Task Force officer, to testify on the second

18  day of the hearing. (Dkt. No. 1253.) Prior to the May 7, 2024 hearing, the Court further instructed

19  the government to identify and present for examination "an individual who is knowledgeable

20  about" "the maintenance (electronic and hard copy), existence, and general contents of

21  individuals' confidential CDCR central files ('C-Files')." (*See* Dkt. No. 1264.) This was necessary

22  to preserve judicial economy and ensure that litigants had an accurate picture of the types of

23  CDCR files and databases potentially queried by Chua in connection with his Task Force work.

24  On May 7, 2024, the Court heard testimony from FBI Special Agent Jimenez as well as CDCR

25  Special Agent Gina Ramos, the agency's designee.

26      ///

27      ///

28      ///

United States District Court
Northern District of California

3

Generally, and as relevant here, the evidentiary hearing revealed six categories of additional details concerning interactions between CDCR and the Task Force.[1]

**No. 1: Chua Searched CDCR Databases.** Chua searched CDCR records, using his CDCR credentials, to support the Task Force at various points during the investigation and not pursuant to subpoena. Prior to the end of the wiretaps, this primarily involved (i) querying CDCR databases and speaking with officials at CDCR facilities to identify specific individuals mentioned or appearing on the wires; and (ii) notifying CDCR facilities when such individuals might have been in danger.[2] Beginning after the wiretaps ended, in April 2019, Chua conducted targeted searches of CDCR databases in response to requests from the Task Force. His goal was to identify specific records, based on requests he received, that the Task Force might wish to subpoena.[3] The searches pertained to charged defendants' assaults, gang

---

[1] That the evidentiary hearing resulted in greater clarity as to the interactions between CDCR and the Task Force is not in dispute. The government concedes that "Chua and [FBI] Special Agent Jimenez provided greater detail at the evidentiary hearing about . . . Chua's access to CDCR records, details that were not previously known to the undersigned counsel . . . ." *See* Dkt. No. 1321-2, United States' Position Statement Regarding FBI Task Force Investigation ("Gov't's Position Statement") at 6:18–20 (sealed).

Although they appear to appreciate the government's candor, the defendants nonetheless assert that the government's failure to identify and disclose the extent of such involvement raises significant concerns and warrants sanctions as well as relief. To that end, defendants' Statement of Position quotes extensively from government submissions predating the evidentiary hearing in order to demonstrate inconsistencies. *See, e.g.*, Dkt. No. 1316-1, Defendants' Statement of Position; Motion for Reconsideration of Objections to Denials of Discovery Orders and Denials of Wiretap and Vindictive Prosecution Orders; Request for Sanctions ("Defs' Position Statement") at Section I.A. The Court omits discussion of such submissions from this background section, instead focusing on the key takeaways from the two days of testimony, as that is what informs the Court's analysis, which would not be necessary if the evidentiary hearing had not revealed new information to both parties and the Court.

[2] *See* Dkt. No. 1265, Transcript of April 29, 2024 Evidentiary Hearing ("4/29 Hrg Tr.") at 44:2–6; *see also id.* at 15:13–19; 16–20 (describing Chua's review of CDCR materials for identification and threat mitigation purposes). As far as Chua is aware, he only queried documents relative to one cooperator in this case, someone who at the time was "a suspect target" and not yet a cooperator. *See id.* at 52:24–53:2. Otherwise, Chua testified that he did not run targeted searches for "inmates who would potentially give—or cooperate with the FBI." *See id.* at 77:12–15.

[3] *Id.* at 44:7–18; 36:8–15; 77:5–11.

United States District Court
Northern District of California

validation by CDCR, and identification;[4] they were not "random searches."[5] Chua's practice was to summarize to Task Force agents his findings verbally rather than show them CDCR documents or read to them from such documents.[6] Similarly, he did not provide his CDCR credentials to Task Force agents; all querying of CDCR databases happened through him.[7]

**No. 2: Chua Received Five Cell Phones from CDCR.** Approximately five cell phones used by individuals picked up on federal wiretaps were seized by CDCR after the wiretap recordings were processed.[8] When this occurred, Chua sometimes retrieved the cell phones and took them to be forensically examined. Chua did not ask for a warrant for the phones and received alongside the physical items a document detailing their chain of custody.[9]

**No. 3: Chua Obtained Certain Documents from CDCR Without Subpoenas.** Chua obtained a limited number of documents informally from CDCR without the Task Force having first subpoenaed them.[10] One, Chua obtained a "manpower roster" from CDCR's San Quentin facility. Chua appended the roster, as well as the confidential CDCR memorandum in which the roster appeared, to an FBI Form 302 Report he compiled for the Task Force.[11] Two, Chua also obtained from CDCR confidential Rules Violation Reports relative to the cell phones CDCR seized from individuals appearing on the wires. These documents were later subpoenaed by the

---

[4] *Id.* at 79:11–16.

[5] *Id.* at 80:5; *see also id.* at 45:9–15.

[6] *See, e.g.*, *id.* at 26:12–23; 36:16–37:2. The Court asked Chua directly whether he ever "read from a document" when summarizing its contents for Task Force superiors. He replied that he did not. *See id.* at 48:16–18.

[7] *Id.* at 13:16–21.

[8] *Id.* at 27:6–12, 22–24.

[9] *Id.* at 27:6–28:11; *see also id.* at 95:18–25.

[10] The list that follows is not intended to be exhaustive. However, it does represent those documents which the parties concentrated on at the evidentiary hearing and mentioned in the parties' respective position statements.

[11] *See* Defendants' Exhibit 100.

Task Force but had not been subpoenaed at the time they were provided to Chua.[12] Three, Chua ran a report within CDCR databases for the housing and commitment history of a cooperator.[13]

**No. 4: Debriefings of NF Members Occurred With Both CDCR and Task Force Officers Present**. Debriefings of purportedly gang-affiliated adults in custody ("AICs") of CDCR[14] sometimes occurred with both CDCR and FBI officers in attendance. The Court heard testimony that the Task Force officials involved in these debriefs included Chua and FBI Special Agents Jimenez and Hotema.[15] Special Agent Jimenez testified that the interviews were "FBI-led" and that CDCR officials' involvement was minimal.[16] As Special Agent Jimenez described it, CDCR officers did not take notes and did not ask the majority of the questions.[17] Instead, they were there to ensure the FBI was "being told the truth regarding [the individual's] ability to cooperate, if they were going to cooperate, or if they were giving us misinformation regarding a facility or their role in the organization."[18]

///

---

[12] 4/29 Hrg. Tr. at 31:4–13. Chua appended these reports to FBI Form 302's he authored in his capacity as a Task Force officer. *See* Defendants' Exhibits 109 & 111.

[13] *See* Defendants' Exhibit 127; *see also* Dkt. No. 1266, Sealed Transcript of April 29, 2024 Evidentiary Hearing ("Sealed 4/29 Hrg Tr.") at 57–63.

[14] Defendants provided at least one example of a debrief by the Task Force, with CDCR present, when the individual was *outside* CDCR custody. *See* Dkt. No. 1293, Transcript of May 7, 2024 Evidentiary Hearing ("5/7 Hrg Tr.") at 233:7–19. The mere existence of one such out-of-custody interview does not compel a contrary result for at least two reasons. One, the individual, a cooperator, was previously in CDCR custody. Thus, the Court considers that CDCR could have an interest in being present for the conversation. Two, the defense elicited testimony stating that CDCR played a largely passive role at debriefings conducted by the Task Force. That testimony was not caveated to suggest CDCR's passive role only applied for in-custody debriefings.

[15] *See, e.g., id.* at 167–68. Notably, the defense also elicited testimony regarding the activities of an FBI agent named Brian Walsh. However, he was part of a different federal investigation. *See id.* at 159:17–19; 196:2–6.

[16] *Id.* at 167:13–17.

[17] *Id.* at 167:19–168:8.

[18] *Id.* at 168:3–14.

6

**No. 5: Certain Records are Stored Locally by CDCR Facilities, Not in C-Files**. Each CDCR facility retains possession of certain documents and physical evidence at their facilities.[19] The Court heard testimony that such documents may not be digitized and were not electronically searchable in a centralized CDCR database at the time of Chua's research.[20] Thus, he would not have had access to such records unless he requested them directly from the facilities or traveled to inspect them in person, neither of which he did; Chua did not enter any physical CDCR file rooms, nor did any other Task Force member as far as Chua knows.[21]

**No. 6: CDCR Information was Informally Shared with Special Agent Jimenez.** FBI Special Agent Jimenez testified that he received information informally from CDCR. For instance, he received background information from CDCR in connection with his preparation of a sworn affidavit submitted on July 17, 2019 in support of the Task Force's request for permission to collect audio and video recording of a prison yard at a CDCR facility.[22] Special Agent Jimenez specifically relied on insights from a CDCR official named Drew Bittner and two members of his team to prepare the wiretap request.[23] Such CDCR officers allowed Special Agent Jimenez to review "a hit on the yard"[24] and shared information regarding the physical layout of the yard to inform the Task Force's strategy in terms of where to place recording devices.[25] This was the only

---

[19] *See, e.g.*, *id.* at 36–37.

[20] *See, e.g.*, 4/29 Hrg Tr. at 65:6–13 (explaining that certain additional information relative to a rules violation could be stored locally at an institution, such as "additional video taken of the crime [scene] or follow-up interviews of other inmates regarding that incident"); *see also* Sealed 4/29 Hrg Tr. at 91:2–6.

[21] 4/29 Hrg Tr. at 38:2–7.

[22] *See* 5/7 Hrg Tr. at 118–19. Special Agent Jimenez also received information from CDCR Officer Bittner regarding a CDCR source in a particular facility. *Id.* at 208:21–24.

[23] *See id.* at 129–131. Chua may have also shared background information with Special Agent Jimenez. *Id.* at 201:24–202:3.

[24] *Id.* at 133:4–5.

[25] *See, e.g.*, *id.* at 134:15–19.

7

1   time that the Task Force sought and obtained permission to place recording devices in a prison

2   yard, and it was ultimately not successful.[26]

3          In addition, the Court also heard testimony that Special Agent Jimenez received informal

4   suggestions and information from a CDCR official named Edgar Ramos, who served as a sort of

5   in-house expert on NF. This information-sharing primarily concerned the leadership and structure

6   of the criminal enterprise.[27]

7          C.  Additional Productions

8          Following the hearings and in light of the additional evidence referenced above, the Court

9   exercised its discretion to order limited additional productions of CDCR documents. The logic

10  behind these additional productions was twofold: One, the Court addressed asymmetries between the

11  parties relative to the CDCR materials reviewed by Chua in connection with the Task Force

12  investigation. Two, the Court ensured the government had conducted an adequate *Brady* review of

13  the documents most likely to contain exculpatory evidence (*i.e.*, information pertaining to the

14  cooperators who will testify against at trial).

15         These productions occurred in two steps. First, on May 3, 2024, the Court ordered CDCR

16  to produce the following records, which were subsequently provided to defense:

17         Any and all (a) confidential memoranda referenced in the [cooperators'] Rules Violation
       Reports that are contained within the confidential sections of their Central Files; (b)
18     documents containing statements by the [cooperators] about [certain of the defendants
       named in the Indictment]; and ([c]) mental health records of the [cooperators].

19
20  (Dkt. No. 1267 at 1:19–2:10 (sealed).) CDCR was also ordered to produce "[a]ny and all

21  confidential memorandum relating to the [charged incidents]." (*Id.* at 2:11–23 (sealed).)

22         Second, on May 9, 2024, the Court ordered CDCR to produce *to the government* certain

23  additional materials consisting of the cooperators' entire C-Files, inclusive of "debriefing reports;

24  _____

25     [26] *See id.* at 135:8–9; 188:13–15.

26     [27] *See, e.g.*, *id.* at 150–52. Notably, Special Agent Jimenez demurred when asked whether
    Ramos necessarily conducted archival searches to gather information he provided to the Task
27  Force. Jimenez viewed much if not all of the information he received from Ramos as coming from
    his memory. *Id.* at 151–52.

28

United States District Court
Northern District of California

notes, audio or video recordings, or other media of debriefings; kites; cell phone materials; and grievances." (Dkt. No. 1282 at 1:18–27 (sealed).) The Court gave the government a choice relative to this production: to the extent it could conduct a *Brady* and Jencks[28] review of the materials prior to May 20, 2024, then it need only produce to the defense those documents containing potentially exculpatory evidence. However, any documents unreviewed as of May 20, 2024 had to be produced to the defense in their entirety to facilitate trial preparation. (*See id.* at 2 (sealed).) The government chose the first option, timely completed their *Brady* and Jencks review, and disclosed certain documents to the defense.

The adequacy of the government's *Brady* and Jencks review of the above-referenced materials was discussed at a pretrial conference held on May 23, 2024. The Court heard *ex parte* argument from the defense and learned that, for memoranda or other materials, the government produced only the pages of those records containing potentially exculpatory information, not the entire documents.  The Court subsequently ordered the government to produce to the defense, under the existing Attorneys' Eyes-Only Protective Order, "the entirety of the debriefing reports which the government identified as containing *Brady* and/or Jencks information and excerpted." (Dkt. No. 1317 at 3:17–19.)

Thus, in sum, the Court's orders have resulted in the defense counsel receiving the following additional documents from CDCR: (i) any confidential memoranda referenced in the cooperators' Rules Violation Reports that are contained in the confidential section of their C-Files; (ii) any documents containing statements by the cooperators about the trial defendants; (iii) the mental health records of the cooperators; (iv) any confidential memoranda relating to the charged incidents; and (v) the entirety of the debriefing reports in the cooperators' C-Files which the government identified as potentially containing exculpatory evidence.[29]

_____

[28] The Jencks Act "requires prosecutors to turn over to the defense statements made by testifying witnesses if those statements are in the prosecutor's possession." *See United States v. Fort*, 478 F.3d 1099, 1102 n.4 (9th Cir. 2007) (Wardlaw, J., et al., dissenting) (citing 18 U.S.C. § 3500).

[29] In addition to the aforementioned productions, the government represents that "CDCR subsequently agreed to accept a subpoena from the government for the confidential sections of the

## II.   LEGAL FRAMEWORK

"Under both *Brady*[30] and [Federal Rule of Criminal Procedure] 16, the government 'has no obligation to produce information which it does not possess or of which it is unaware.'"[31] *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) (quoting *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995)). "Possession" for the purposes of this standard  "is not limited to what the prosecutor personally knows." *Id.* Instead, "[b]ecause prosecutors are in a unique position to obtain information known to other agents of the government, they have an obligation to disclose what they do not know but could have learned." *Id.* at 1022 (cleaned up); *see also Carriger v. Stewart*, 132 F.3d 436, 480 (9th Cir. 1997) (en banc) (same).

Applying this standard requires courts to assess the prosecutors' "knowledge of and access to the documents sought by the defendant'" in order to determine what can be deemed to have been in their constructive or actual possession. *Cano*, 934 F.3d at 1025 (quoting *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989), *cert. denied*, 493 U.S. 858 (1989)). As a general matter, federal prosecutors "will be deemed to have knowledge of and access to anything in the possession, custody or control of any *federal* agency participating in the same investigation of the defendant." *Bryan*, 868 F.2d at 1036 (emphasis supplied); *see also Kyles v. Whitley*, 514 U.S. 419,

---

SOMS and ERMS potions of the Central Files for the trial defendants themselves." Gov't's Position Statement at 10:25–27. Once received, "[t]he government conducted a *Brady* review of those records and identified only five documents (comprising approximately 100 pages) to produce, and did so on May 29, 2021. The government has now conducted a full review of the SOMS and ERMS databases for all cooperating witnesses and trial defendants—these are the databases that . . . Chua testified he accessed." *Id.* at 10:25–11:3.

[30] "*Brady* material is normally understood to include *Giglio* material as well. So when this order refers to '*Brady*' or '*Brady* information,' the reader will please understand that *Giglio*, *Henthorn*, and all information required by *Brady and its progeny* are included." *United States v. Cerna*, 633 F.Supp.2d 1053, 1055 (N.D. Cal. 2009) (emphasis in original).

[31] Because this order focuses on federal prosecutors' possession of various materials (which encompasses the knowledge and access inquiry), the Court refers interchangeably to *Brady* and Rule 16. *See Cano*, 934 F.3d at 1023 n. 16 ("The 'possession' element of *Brady* is treated as coextensive with that of Rule 16."). The Court understands *Brady* and Rule 16 involve distinct considerations in other contexts.

United States District Court
Northern District of California

437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). However, federal prosecutors are not presumed to have had access to *state* agencies' records.[32] *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995). "Where the government uses a state agency as a 'lead investigating agent,'" though, "the state agency is deemed to be the government's agent within the meaning of *Brady*." *United States v. Etienne*, 2018 WL 6305614, at *2 (N.D. Cal. Dec. 2, 2018) (quoting *United States v. Price*, 556 F.2d 900, 908–09 (9th Cir. 2009)).

Because the Ninth Circuit has cautioned that the scope and applicability of "*Brady* and Rule 16 obligations," such as those described above, "are case specific," *Cano*, 934 F.3d at 1025, the Court conducts a fact-intensive assessment of the coordination between state and federal officials in order to resolve the instant dispute. The Court turns for helpful guidance in this respect to another case from this district involving roughly analogous facts: *United States v. Cerna.*

A. <u>*United States v. Cerna*</u>

*Cerna* was a 31-defendant criminal RICO prosecution of the MS-13 street gang. *United States v. Cerna*, 633 F.Supp.2d 1053, 1055 (N.D. Cal. 2009). Notably, the prosecution was "just one part of a nationally organized effort" to prosecute members of the criminal enterprise. *Id.* To that end, the United States Attorney's Office ("USAO") for this district publicly stated that "officers and agents from numerous federal, state, and local law enforcement agencies provided substantial support during [the Indictment]." *Id.* The government took the position, however, that only the FBI and Immigration and Customs Enforcement acted as the USAO's "agents" for *Brady* purposes. *Id.* As relevant here, the defendants challenged that position, asserting the government's *Brady* obligations extended to additional law enforcement agencies, including local police. *Id.* The court addressed defendants' arguments in two steps: first, by ruling on the relationship between

---

[32] The Court agrees with the analysis in *United States v. Corbett* insofar as the court there concluded that relying on *Santiago* for the proposition that a federal prosecutor can never be deemed to have actual or constructive knowledge of state agencies' records paints with too broad a brush and does not "obviate the [established] knowledge and access standard, or the rule that agency involvement in an investigation satisfies that standard as to materials within the scope of the investigation." *See* 2023 WL 1930642, at *3 (E.D. Cal. Feb. 10, 2023).

federal agencies and the prosecution, *id.* at 1059, and second, by ruling, after an evidentiary hearing, on the relationship between the government and the San Francisco Police Department ("SFPD"). *See United States v. Cerna*, 2009 WL 10823687, at *2, *10 (N.D. Cal. Oct. 5, 2009). The latter analysis is most relevant here given the obvious factual similarities.

As to the relationship between the SFPD and federal task force, the court made findings of fact before performing a legal analysis. Among the court's factual findings were these: (i) federal authorities sometimes informed the SFPD of "the location of certain evidence or crimes in progress;" (ii) contact information for certain SFPD officers was shared with "confidential federal informants for contacting the SFPD as necessary to ensure personal or public safety;" (iii) "on occasion, evidence seized by the SFPD in connection with state criminal investigations was forwarded to federal agents;" (iv) "SFPD officers were present at a federal debriefing of suspected MS-13 members;" and (v) a written cooperation agreement was executed between the SFPD and task force. *Id.* at *4. In addition to these specific instances of cooperation, "there was also an ongoing process of 'informal' information sharing between various SFPD officers and federal law enforcement agencies." *Id.*

Notwithstanding this coordination, the court concluded that, as a factual matter, "SFPD did not subject itself to the direction and control of federal authority for purposes of gathering evidence in the case." *Id.* at *5. "SFPD officers did not report to or take orders from federal law enforcement officers." *Id.* Further, "neither the SFPD nor its materials" were under federal control. Federal agents instead had to rely on "specific procedures to view or obtain SFPD documents." *Id.* As a result, "the federal prosecution did not have unfettered access to SFPD documents and materials and federal agents could not simply roam through [the SFPD] file room . . . ." *Id.* at *6.

After setting forth the above factual findings, the court applied the legal framework developed by the Ninth Circuit in *United States v. Price*, 566 F.3d 900 (9th Cir. 2009). Finding it accurate, this Court reproduces below the *Cerna* court's summary of *Price*:

> In *Price*, the federal prosecutor used a local police detective as his 'lead investigative agent.' Although the prosecutor had instructed him to run a criminal background check on a key governmental witness, the witness' extensive local criminal record went undisclosed. After conviction, the evidence came out in a separate prosecution. Upon this revelation, the prosecutor in *Price* claimed that he had not been told by his lead investigative agent about

United States District Court
Northern District of California

the results of the background check and thus there had been no intentional withholding. The Ninth Circuit held that the federal prosecutor had a duty to learn of and disclose favorable defense evidence in the possession of the lead investigating agent . . . .

. . . .

*Price* is the only Ninth Circuit decision to find that a state (or local) agent qualified as a 'lead investigative agent' in a federal prosecution. There, the agent was *both* a special agent with the Bureau of Alcohol, Tobacco and Firearms and a Portland police officer. He occupied the customary and important role of the case agent assisting the prosecutor throughout the investigation and trial, usually sitting at counsel table. The agent was clearly subject to the direction and control of the prosecutor. The latter 'instructed' and 'directed' the agent, according to the opinion . . . .  He was called the 'lead investigative agent' and the 'lead investigating officer' by the circuit court . . . and 'my agent' by the prosecutor . . . , who further said the agent had examined records 'on [his] behalf' . . . .

*Id.* at *7–8 (citations omitted) (emphasis in original).

Having explained its interpretation of *Price*, the court then juxtaposed the SFPD's activities against those of the "lead investigative agent" in that case, finding them entirely distinct. Unlike the Portland police officer in *Price*, for instance, no SFPD officials served a similar role with respect to supporting the prosecution in court proceedings. *Id.* at *8. At most, SFPD officers "supplie[d] information for and cooperate[d] with a federal prosecution," which fell well short of the intimate role the Portland officer placed in *Price. Id.* Relatedly, the mere fact that the SFPD provided federal authorities with records either via subpoena or "voluntarily upon request" did "not constitute 'acting on the government's behalf.'" *Id.* The court explained that, were it to hold otherwise, "every person who cooperates with a federal investigation would be deemed a federal agent and the federal prosecutor would be deemed to have constructive knowledge of everything in his or her possession, custody or control." *Id.* Such an outcome would be untenable.[33] As a result, the court found the SFPD was not a "lead investigative agent" under *Price* and, as such, the government's *Brady* obligations did not extend to all SFPD records.

///

///

---

[33] *See Cerna*, 2009 WL 10823687, at *8 ("This would impose an impossible burden on the prosecutor to search for needles in haystacks over which the prosecutor had no right of access or right of control.")

United States District Court
Northern District of California

### III.    ANALYSIS

The Court has previously held, repeatedly, that the Task Force that conducted the investigation leading to the Indictment was FBI-led. Indeed, there can be no reasonable dispute that the FBI set the Task Force's agenda, selected targets, stored records, hosted meetings, and oversaw hiring, including of Chua as a deputized officer. CDCR officials were not even a part of the Task Force when it was first created, nor during its first year.[34] Further, this prosecution was brought by prosecutors in the USAO, who partner regularly with the FBI in connection with federal law enforcement actions. The Court discerns no evidence proffered by the defense, whether in their papers or at the evidentiary hearing, that meaningfully undermines these conclusions, such as by showing that CDCR held joint decision-making power with the FBI.[35] Thus, the Court concludes that the investigation was led solely by the FBI Task Force.

Having concluded that the investigation was not a joint operation of CDCR and the FBI, the Court turns next to the key inquiry underlying the instant dispute: whether CDCR was "acting on the government's behalf in the case." *Cerna*, 2009 WL 10823687, at *7. For the purposes of this inquiry, the Court revisits the testimony of CDCR Officer Chua, FBI Special Agent Jimenez, and CDCR Special Agent Ramos as elicited at the April 29, 2024 and May 7, 2024 evidentiary hearing and summarized above.

While the testimony of these law enforcement officials provided new insights into the interactions between CDCR and the Task Force, the lion's share of such interactions is not dissimilar from the informal information sharing across law enforcement agencies in *Cerna*.

---

[34] 5/7 Hrg. Tr. at 88:12–89:18.

[35] The government cites *United States v. Ferguson*, 478 F.Supp.3d 220, 239–41 (D. Conn. 2007) for the proposition that "federal agents conducted 11 witness interviews alongside state agents and attorneys 'to spare the witnesses from the burden of multiple sessions with several different agencies'" but this "did not render it a 'joint' federal-state investigation for purposes of *Brady* or Jencks." Gov't's Position Statement at 5:24–27 (sealed). However, this misses the point. There, the federal and state agents conducted interviews alongside one another. Here, the interviews were FBI-led with minimal, if any, involvement by CDCR officials. Thus, the government's argument that the Task Force did not engage in a joint investigation with CDCR is in fact even stronger than in *Ferguson*.

United States District Court
Northern District of California

1  There, the court found such information sharing did not transform a state agency into an agent of

2  the federal government for the purposes of *Brady* and Rule 16 analyses. *See id.* at *4–5. Indeed,

3  such information exchange is "one of the primary aspects and purposes of a federal task force."[36]

4  To find otherwise could imperil a key component of this country's ability to conduct complex law

5  enforcement investigations involved federal and state agencies. *See id.* at *8 ("Assisting' and

6  'cooperating' do not translate to 'acting on behalf of.' Otherwise, every person who cooperates

7  with a federal investigation would be deemed a federal agent and the federal prosecutor would be

8  deemed to have constructive knowledge of everything in his or her possession, custody or control.

9  This would impose an impossible burden on the prosecutor . . . .").

10     That said, the Court addresses three categories of evidence adduced at the evidentiary

11  hearing which may suggest more involvement by CDCR in the investigation than mere informal

12  information sharing. Among these are (i) Chua's searches of CDCR databases to identify

13  documents for the Task Force to subpoena and for threat mitigation and identification purposes;

14  (ii) Chua obtaining approximately five cell phones seized by the CDCR; and (iii) the attendance of

15  CDCR officers at Task Force-led debriefs of purported NF affiliates. The Court considers each.

16     *One*, Chua's searches of CDCR databases to identify records for the Task Force to

17  subpoena and for threat mitigation and identification purposes does not amount to the Task Force

18  exercising "unfettered access" to CDCR systems. Preliminarily and as a factual matter, the mere

19  fact that Chua queried CDCR databases for records responsive to Task Force concerns is

20  distinguishable from the "unfettered access" the federal government exercised in *Price*. There, the

21  Portland police officer who served as the federal government's "lead investigative agent" was

22  directed by the Task Force to locate and obtain documents for federal authorities' review.  *See,*

23  *e.g.*, *Price*, 566 F.3d at 903, 911 (noting that the federal prosecutor in that case "instructed" his

24  lead investigative agent "to run a criminal history check" and report back). Here, under

25  circumstances more akin to those in *Cerna*, the Task Force had a protocol for obtaining CDCR

26  documents via subpoena. *See Cerna*, 2009 WL 10823687, at *5 (referring to the federal task

27

28     [36] 5/7 Hrg Tr. at 198:16–17.

1    force's procedures for accessing SFPD records). The Task Force honored that policy in at least the

2    83 occasions where grand jury or administrative subpoenas were served on CDCR.[37] Thus, the

3    Court finds the Task Force, through Chua, did not have "unfettered access" to CDCR records.[38]

4         Separately, the Court does not consider the fact that Chua communicated with CDCR

5    officials regarding potential imminent threats to the safety of AICs in CDCR custody to be

6    evidence of impermissible information sharing.[39] It strains credulity to assert that the Task Force

7    _____

8         [37] *Id.* at 102:17–103:6.

9         [38] This analysis parallels what the court in *Cerna* referred to as the "second avenue" for
     federal prosecutors' *Brady* obligations to extend to local law enforcement records. The court there
10   wrote:

11        A second avenue arises when, even though the local agency is not a 'lead investigative
          agent,' the federal prosecutor consults local police records. When state police gives a
12        federal investigator access to its files for the purpose of pulling items of interest to a
          federal investigation, Brady requires that the prosecution team review as well for Brady
13        materials within the same universe of files. In this instance, separate sovereignty no longer
          matters. The reason is that the state has invited the federal authorities into its file room and
14        given access to the evidence. Once inside the stacks with permission to rummage about for
          prosecution evidence, the federal authorities must search for and retrieve defense evidence
15        bearing on the same question. The same would hold if the access is only by mere requests,
          *i.e.*, if the local police allow the federal prosecutor to make written or verbal requests for
16        records searches to be conducted by local officers, then the federal prosecutor must ask for
          all information on the same subject, pro and con. This arises not because there is 'agency'
17        but because the federal prosecution team is given free access to retrieve information and
          the search must be even-handed as to the point of inquiry.

18   *Cerna*, 2009 WL 10823687, at *9 (quoting *Cerna*, 633 F.Supp.2d at 1060).

19        This Court views the above analysis of the Task Force's purportedly "unfettered access" to
     CDCR records as coextensive with the "second avenue" analysis conducted by the *Cerna* court.
20   Both are fundamentally about the same thing: whether federal prosecutors had free reign to inspect
     records of subordinate law enforcement agencies and to pull from such records documents of use
21   to the investigation and/or prosecution. Here, that did not happen. It is well established that Chua
     reviewed confidential portions of C-Files for various individuals in CDCR custody, including the
22   trial defendants. However, he did not pull such documents for the Task Force's immediate use,
     instead following protocol (in at least 83 instances) to file subpoenas for such documents. Further,
23   as stated previously and reiterated *infra*, the Court immediately ordered additional productions of
     documents designed to reflect the scope of Chua's review of CDCR records, knowing that a
24   formal order would take additional time.

25        [39] The government contends this "threat mitigation was required both by FBI policy and
     the wiretaps themselves, and given the use of monikers on the calls, a targeted search was
26   necessary to fulfill these duties." Gov't's Position Statement at 7:24–26. It does not, however, cite
     authority for such assertions, let alone to the FBI policies contemplated. Given these shortcomings
27   and in order to expedite the issuance of this Order, the Court does not consider this argument on
     the grounds that it is not fully developed.
28

should have sat on information that could have life or death consequences for fear of blurring the lines between it and the CDCR. *See also id.* at *4 (noting that the SFPD and federal task force in *Cerna* communicated about safety issues and crimes in progress). FBI Special Agent Jimenez testified to this effect, saying, "Due to the threat mitigation that was viable during the interception period, by the time we would receive returns from a subpoena, the threat or impending hit could have already occurred and a victim could have been hit."[40] The Court credits this testimony.

*Two*, the fact that Chua obtained approximately five cell phones seized by CDCR on behalf of the Task Force is insufficient to establish that CDCR acted as the government's agent. FBI Special Agent Jimenez testified that he *did not direct* CDCR to seize the cell phones in question. Instead, he observed that he thought "because they knew we were down on target telephone lines and knew the location of certain cell phones which was part of the threat and risk mitigation that we provided them," they volunteered the cell phones without being asked.[41] That Chua received the phones without having ordered them produced is a meaningful distinction and, again, aligns this case more closely to *Cerna*, where the court noted that, "on occasion, evidence seized by the SFPD in connection with state criminal investigations was forwarded to federal agents . . . ." *Id.* at *5.

*Three*, CDCR officials' presence at Task Force debriefings does not transform those debriefings into joint investigations. Preliminarily, the vast majority of the debriefs were of AICs in CDCR custody. It is unremarkable, therefore, that the CDCR would wish, at a minimum, to monitor interviews of such individuals inside their own facilities. FBI Special Agent Jimenez's testimony does not suggest CDCR officials played any more active a role than that of a passive listener. In addition, the fact that the Task Force did not require CDCR to alert it of AICs desiring to debrief further underscores the FBI-led nature of the debriefings. As FBI Special Agent Jimenez testified, such individuals' counsel often informed the Task Force of their clients' desire to meet or, alternatively, the individuals were referenced on wires and the Task Force approached them to

---

[40] 5/7 Hrg Tr. at 97:20–24.

[41] *Id.* at 100:13–22.

United States District Court
Northern District of California

1    see if they would be willing to cooperate.[42] Thus, while CDCR may have been physically present

2    at the debriefs, CDCR does not appear to have  selected interviewees, set the agenda, asked most

3    questions, kept notes, nor otherwise taken an active role in the discussions.

4         Having established that informal information sharing between law enforcement agencies

5    does not transform one into the agent of another and having clarified that the additional

6    information revealed during the evidentiary hearing does not establish the CDCR acted at the

7    direction of the Task Force, the Court concludes that CDCR was not subject to the control of the

8    Task Force during the investigation leading to the Indictment. As in *Cerna*, this case is an example

9    of a law enforcement mobilization involving limited cooperation across the state/federal divide,

10   not an example of a case like *Price* where a federal investigation treated a specific deputized

11   officer as a lead investigative agent for myriad purposes. Thus, the Court FINDS that the CDCR

12   did not play the role of a government agent, or lead investigative agent, in the Task Force

13   investigation of the trial defendants.

14        Defendants' counterarguments do not require otherwise. While the Court declines to revisit

15   each of defendants' objections to the legal framework set forth above, it clarifies several points raised.

16        First, defendants take the position that *Price*'s use of the phrase "lead investigative agent"

17   was dicta and that the phrase itself was intended as a term of art, not legal concept. (*See, e.g.*,

18   Defs' Position Statement at 12:2–3 (sealed).) The Court disagrees. The phrase is used multiple

19   times in the Ninth Circuit's opinion, including in legal conclusions, and the question of whether

20   the Portland officer was a lead investigative agent subject to the control of federal authorities was

21   at the core of the dispute. *See, e.g.*, *Price*, 566 F.3d at 903 ("Because, here, the prosecutor failed to

22   fulfill his duty to learn of and disclose favorable evidence that likely was in the possession of his

23   lead investigating officer, and because the evidence of [the witness's] criminal history is material,

24   we hold that the prosecutor violated Price's rights under *Brady* . . . ."); *id.* at 911 (concluding that

25   certain testimony revealed "that, at the least, the prosecutor failed in his 'duty to learn' the results

26   of the investigation he directed his lead investigative agent to perform.").

27

28        [42] *See*, *e.g.*, *id.* at 176.

18

Second, defendants point this Court to *United States v. Blanco*, *Carriger*, and *Price* for the proposition that the Ninth Circuit has used the term "government agent" on numerous occasions to designate entities to which a *Brady* obligation applies, and that this phrasing should be viewed as authoritative, rather than "lead investigative agent." (*See* Defs' Position Statement at 12:12–23 (sealed).) This is, of course, true. The Court of Appeals has indeed used that phrase, as have other courts, when discussing the scope of *Brady*. However, neither *Blanco* nor *Carriger* involved purported federal-state cooperation. *See United States v. Blanco*, 392 F.3d 382, 392, 397 (9th Cir. 2004) (discussing coordination between federal authorities and both the Immigration and Naturalization Service and Drug Enforcement Agency); *Carriger*, 132 F.3d at 479–82 (analyzing state prosecutors' *Brady* obligations relative to state Department of Corrections records against the backdrop of a federal habeas proceeding). Thus, of these three cases, only *Price* is analogous to the instant matter. The Court considers *Price*, both on its own and as interpreted by *Cerna*, to be controlling authority on the scope of *Brady* and applies it here.

Third, and relatedly, defendants criticize the Court for reliance upon what they suggest is a relatively untested concept: that of the "lead investigative agent." The Court disagrees. This concept has been invoked multiple times, and not just in *Price* and *Cerna*. For instance, Chief Judge Mueller of the Eastern District of California invoked the concept earlier this spring. *See United States v. Yandell*, 2024 WL 1678762, at *2 (E.D. Cal. Apr. 18, 2024). In an order dated April 18, 2024, she applied *Price*'s "lead investigative agent" framework to a motion analogous to the requests pending before the Court. After considering the minimal evidence supporting defendants' theory of federal-state coordination, she found as follows: "Because nothing in the record before the court supports the conclusion the CDCR acted as the federal government's agent, *let alone its lead investigative agent*, the government in this case cannot be deemed to have access to CDCR documents generally; therefore it cannot be compelled to produce materials within the CDCR's exclusive possession." *Id.* (citation omitted) (emphasis supplied). It is therefore inaccurate to dismiss the concept of "lead investigative agent" as without support in the case law.

Lastly, defendants have at various points over the past several months raised the notion that *Price* and its progeny *Cerna* do not foreclose a finding that multiple law enforcement agencies

or officers served as "lead investigative agents." The Court agrees. However, this is immaterial to the outcome here because the Court discerns no reason to hold that CDCR (or Chua, specifically) served as a lead investigative agents in the investigation leading to the Indictment.

*      *      *

Given the foregoing analysis, the Court rejects defendants' repeated, and unsubstantiated, "all or nothing" approach of insisting that the government conduct a *Brady* review of *all* documents in CDCR's possession. The authority cited herein, and the factual circumstances, not to mention practical considerations relative to law enforcement operations, do not support such a ruling .

Further, the Court reminds the parties that, the preceding analysis notwithstanding, the Court has repeatedly ordered additional production of documents and *Brady* review to align the government and the defendants and to mitigate any prejudice that might have otherwise accrued to the defendants based on Chua's (and by extension, the Task Force's) actual review of certain CDCR databases. As set forth at length above, the Court specifically required that the government disclose to defense counsel and/or review for *Brady* the entirety of the confidential sections of the C-Files for the trial defendants, cooperators, and individuals tied to the charged incidents, among other categories of records. *See, e.g.*, *supra* note 29. The scope of these existing disclosures and review is important. The government admits that it represents the scope of records gathered by the Task Force during the investigation. (*See* Gov't's Position Statement at 9:17–19.) Since the Court has not heard evidence to suggest that voluminous exculpatory or relevant information of interest to the defense exists elsewhere in CDCR repositories and that the Task Force gathered such records, the Court sees no reason to order additional discovery.[43] Permitting defendants to seek out additional materials from such repositories or to hold additional evidentiary hearings would therefore amount to nothing more than a fishing expedition.[44] The Court declines to order such relief.

_____

[43] To the extent the defense has suggested that the potential storage of relevant documents locally at CDCR necessitates additional discovery, the Court finds they have not sufficiently explained what additional information they would seek from such institutions. Further, and more importantly, no testimony has been offered to suggest that Chua or any other Task Force officer searched those records in connection with the investigation leading to the Indictment.

[44] *See Blackie v. Barrack*, 524 F.2d 891, 906 n.22 (9th Cir. 1975) ("The district judge may

20

United States District Court
Northern District of California

United States District Court
Northern District of California

## IV.    CONCLUSION

For the foregoing reasons, the Court **Finds** the CDCR agency was not subject to the direction and control of federal authorities in the investigation leading to the Indictment. As such, CDCR was not an agent, nor "lead investigative agent," of the federal government for the purposes of *Brady* and Rule 16. The defense is therefore not entitled to discovery and/or a *Brady* review of *all* documents in CDCR's possession.

That said, the Court has taken the step of (twice) ordering the government to produce and/or search for potentially exculpatory evidence sought by the defense. The government also has, on its own accord, conducted additional *Brady* review. Trial procedures are also in place to address timing considerations.  The Court is satisfied that, given the factual and procedural history of these proceedings and in light of these additional productions, defendants' constitutional rights, including to potentially exculpatory evidence in the possession, custody, or control of the government, have not been violated. Defendants' requests for various forms of relief, including sanctions and suppression of wiretap evidence, are therefore **Denied**.[45]

---

reasonably control discovery to keep the suit within manageable bounds, and to prevent fruitless fishing expeditions with little promise of success.").

[45] Defendants bury various requests throughout their Position Statement. For example, defendants assert that, "[b]y withholding the information that not only Jimenez but other FBI agents had access to CDCR confidential information about its investigation while making factual representations inconsistent with Jimenez's later testimony, the government violated due process." Defs' Position Statement at 13:27–14:1. In support, they cite to *United States v. Gamez-Orduno*, for the proposition that, "[t]he suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process *if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different*." 235 F.3d 453, 461 (9th Cir. 2000) (emphasis supplied). The Court determines no such reasonable probability would have existed here had the additional information revealed at the evidentiary hearing come to light earlier. This is for the same reasons set forth at length herein: namely, that FBI Special Agent Jimenez's testimony has not changed this Court's perspective on the nature of the relationship between CDCR and the Task Force.

Relatedly, defendants assert that a separate *Brady* violation occurred when the prosecution "fail[ed] to provide information about the FBI's access to CDCR intelligence and documents prior to the defendants' wiretap motion and . . .  misrepresent[ed] to the Court in opposing the motion to suppress." Defs' Position Statement at 15:18–20. Based thereon, defendants request the Court exclude the wiretap evidence that the defendants previously sought to suppress. The Court

1    **IT IS SO ORDERED.**

2

3    Dated:  June 24, 2024

4    _____

5    YVONNE GONZALEZ ROGERS
     UNITED STATES DISTRICT COURT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    _____

      declines to do so. As discussed on the record, the Court reiterates that the application process for
21    obtaining a federal wiretap is thorough and exacting. The government met their burden with
      respect to the applications at issue and the Court's ruling on the motion to suppress would not
22    have differed were information relative to FBI Special Agent Jimenez's sworn statement to have
      been revealed earlier.
23

24          The defendants' remaining requests have been mooted. At page 16 of their Position
      Statement, they write, "[t]o the extent it has not already done so pursuant to the Court's orders
25    (Dkt. 1267, 1282), the prosecution has an obligation to 'obtain and review'" notes and recordings
      of debriefing interviews "with cooperating witnesses." To the extent the Court has already ordered
26    the government to take particular steps, it assumes the government has done so. The Court makes
      two additional points on this matter: One, the government's *Brady* obligation is self-executing.
27    Two, the Court reminds defendants that the government has conducted a *Brady* review of the
      debriefing memoranda and produced in their entirety to defense counsel documents identified as
28    containing potentially exculpatory information.